## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **WALTER HYDE,** | : | **Civil  No. 3:10-CV-1880** |
| | : | |
| **Plaintiff,** | : | **(Judge Caputo)** |
| | : | |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **NURSE ANN, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

## REPORT AND RECOMMENDATION

### I.    Introduction

This is a *pro se* civil rights action brought on September 8, 2010, by Walter

Hyde, an individual who was intermittently confined in the Northumberland County

Prison at various times between 2006 and 2009.  (Doc. 1.)  In its current form, Hyde's

complaint names three defendants, Ann Yeager, a nurse at the Northumberland County

Prison,  the  prison  warden,  Rick  Reisch,  and  the  Northumberland  County

Commissioners.[1]  Hyde alleges that these defendants violated his constitutional rights

from 2007 through 2009[2], while he was housed in the Northumberland County Prison,

---

[1]Another defendant initially named by Hyde, Dr. Hynick, was previously
dismissed from this lawsuit.

[2]Hyde had initially also alleged neglect of this medical condition during a
prior incarceration in the prison in 2006, but those allegations were dismissed as
time-barred by the statute of limitations.

by providing him with inadequate medical care for a pre-existing medical condition, a form of skin cancer.  (Id.)

This matter now comes before the court on a motion for summary judgment. That motion, and the accompanying exhibits and pleadings, reveal both instances of factual consensus, and numerous, sharp factual controversies relating to Hyde's care and treatment.  Some of these factual disputes are clearly drawn on a complete factual record; others remain both disputed and mired in uncertainty.  The degree of this factual uncertainty defines for us the extent to which summary judgment is appropriate in this case.  Thus, for the reasons set forth below, we will recommend that this motion be granted, in part, and denied, in part.

## II.    Statement of Facts and of the Case

With respect to these allegations, the undisputed facts reveal that sometime prior to September 2006, the plaintiff, Walter Hyde, was living in New York City.  (Doc. 1, ¶ 1.)  While residing in New York in 2005, Hyde was diagnosed with a form of skin cancer which he describes as "basial coranova".  (Id.)[3]  Hyde received treatment of this skin cancer, in the form of excision of small cancerous lesions, in 2005.  According to Hyde following this initial treatment, he moved from New York to Shamokin,

---

[3]This appears to be a reference to basel cell carcimona, which the Mayo Clinic describes as "the most common form of nonmelanoma skin cancer. It's also the most easily treated and the least likely to spread."www. Mayoclinic.com/ health/basal-cell-carcinoma.

Pennsylvania.  (Id., ¶ 2.)  In September of 2006, while he was living in Shamokin, Hyde alleges that he was arrested for some otherwise unidentified criminal activity involving what Hyde described as "an inoperable pistol" or a "toy gun".  (Id.)

Hyde was initially housed in the Northumberland County Prison on these state charges for approximately 7 months.  (Id. ¶ 3.)  During this time, Hyde claims that he was seen by defendant Nurse Yeager, who he identifies as "Nurse Ann."  According to Hyde, he notified defendant Yeager of his medical condition at the time of his initial incarceration.

Hyde was released on bail from the Northumberland County Prison in March of 2007, and remained free on bond under November 9, 2007, when he was sentenced in state court to 12-to-24 months in prison "for the toy gun".  (Id., ¶¶ 4 and 5.) Returned to state custody in November 2007 to serve this sentence, Hyde claims that he notified defendant Yeager of his skin cancer, and sought medical surgical care for the skin cancer.  (Doc. 1, ¶¶ 6 and 7; Doc. 42, p. 34.)

The nature of Hyde's communications with defendant Yeager regarding this medical condition is one of the principal factual disputes in this case, and is a dispute marked by irreconcilable factual accounts from the parties, each of which derives some factual support from the record.  For his part, Hyde alleges that he made numerous requests for care and treatment of these skin cancer lesions to the nurse between November 2007 and the summer of 2008.  Hyde supports this assertion with

an affidavit from a fellow inmate who attests that he was present when Hyde made these requests to Nurse Yeager in 2007 and 2008, as well as a declaration from the plaintiff's's brother, who alleges that he spoke with Nurse Yeager and asked that Hyde receive medical attention for these lesions in June of 2008. (Doc. 46.) Defendant Yeager, in contrast, denies ever receiving any of these requests for medical attention from Hyde in 2007 and 2008. (Doc. 42.) Nurse Yeager supports this assertion by referring to prison medical records, which do not reflect any written requests or grievances relating to medical care issues, (id.), an averment which inspired a rejoinder from Hyde, who attests that he filed grievances but claims that they were ignored or discarded by prison officials. (Doc. 46.)

While the nature of Hyde's complaints, and Nurse Yeager's response to those complaints, during the period from November 2007 through July 2008 remains the subject of a clearly drawn factual dispute, the events of July and August 2008 are largely undisputed. On July 17, 2008, Hyde's brother, Franklin Hyde, wrote to the Warden at the Northumberland County Prison, Rick Reisch, voicing concern about the care the plaintiff's was receiving for his skin cancer. (Doc. 46.) This correspondence inspired a prompt, and appropriate, initial medical response by the prison. Thus, on August 19, 2008, the prison physician, Dr. Hynick met with Hyde, who reviewed his medical records, verified his diagnosis, and issued orders that Hyde should be seen by dermatologists at Geisinger Hospital. (Doc. 42, ¶6.) Hyde was then seen by

specialists at Geisinger Hospital on September 16, 2008, specialists whose examination confirmed that Hyde suffered from a cancerous lesion on his nose which was "enlarging and bleeding." (Doc. 42-1.) The medical records of this dermatology consultation which took place between Hyde and specialists at Geisinger Hospital also reflects that the physicians at Geisinger recommended surgery to excise this skin cancer. (Id.)

Despite this medical recommendation, it is undisputed that Hyde did not receive surgery for this condition for the ensuing twelve months, while he was housed at the Northumberland County Prison.  Instead, it is undisputed that the plaintiff had the surgery performed at Geisinger at some point in the latter part of 2009, after he was furloughed from the Northumberland County Prison, in September of 2009. (Doc. 42, ¶10.)  While this much is undisputed, what is hotly disputed is the reason why Hyde did not undergo surgery for a full year after receiving this diagnosis and recommendation from Geisinger Hospital.  Once again, this factual dispute is framed almost entirely by irreconcilable factual accounts advanced by Hyde and defendant Nurse Yeager.

For her part, Nurse Yeager recites that: "after his evaluation by Dr. Delaney at Geisinger on September 16, 2008, Mr. Hyde advised that he wished to have the recommended surgery done outside the prison and began to seek a medical furlough. Mr. Hyde was not deprived of the surgical procedure that was recommended by Dr.

Delaney.  Mr. Hyde chose not to have the procedure performed at Geisinger Medical

Center during his period of incarceration at Northumberland County Prison." (Doc.

42-1.)  Hyde, in turn, hotly disputes this claim made by Nurse Yeager describing the

claim in the following terms:

> This incredible lie and cover up is too hard for any rational mind to
> believe. Why under any stretch of the imagination would Mr. Hyde tell
> Nurse Yeager for approximately 24 months . . .  That he needed to have
> his cancer removed before it spread to his body and eye and then Nurse
> Yeager claims Mr. Hyde changed his mind and waited another 15 months
> (from Sept. 2008 until Dec. 2009) until he was release after completing
> his full sentence to have the cancer removed?

(Doc. 46, p. 9.)

Instead, Hyde ascribes the decision to deny him medical care solely to cost

considerations, claiming that the defendants sought to avoid the $10,000 expense of

such surgery.  Yet, while Hyde ascribes this motivation to the defendants generally,

Hyde's deposition reveals the speculative nature of this claim.   In fact, in his

deposition Hyde acknowledges that no one ever told him that the prison would not pay

for his treatment.  (Doc. 42-1, Hyde deposition p.13.)  Moreover, in contrast to the

specific factual claims that Hyde has made pertaining to Nurse Yeager, Hyde has

tendered no evidence linking Warden Reisch or the county commissioners to these

particular medical decisions, beyond his speculative assertion that all of the defendants

were motivated to avoid paying for the expense of his treatment.  In fact, with respect

to Warden Reisch, the evidence of record actually contradicts Hyde's claim of indifference, since that evidence indicates that prison officials promptly provided follow-up care to Hyde in August and September of 2008, after Hyde's brother notified the warden of the plaintiff's medical concerns.

On the basis of these often disputed facts, the defendants moved for summary judgment in their favor on January 17, 2012. (Doc. 41.) This motion has been fully briefed by the parties, (Docs. 43, 46.), and is now ripe for resolution. For the reasons set forth below, it is recommended that the motion be granted, in part, and denied, in part. Specifically it is recommended that the motion be granted as to defendant Reisch and the unnamed county commissioners, but denied at to defendant Yeager, since there are disputed material issues of fact relating to the actions of defendant Yeager in this case.

## II.   Discussion

### A.   Summary Judgment– Standard of Review

Rule 56(a) of the Federal Rules of Civil Procedure provides as follows:

A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  The court should state on the record the reasons for granting or denying the motion.

Fed. R. Civ. P. 56(a).[4]  For purposes of Rule 56, a fact is material if proof of its existence of nonexistence might affect the outcome of the suit under the applicable substantive law.  Haybarger v. Laurence Cnty. Adult Prob. & Parole, 667 F.3d 408, 412 (3d Cir. 2012) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  For an issue to be genuine, "all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  Id. (quoting Anderson, 477 U.S. at 248-49).

Accordingly, in support of a motion for summary judgment, the moving party must show that if the evidence of record were reduced to admissible evidence in court, it would be insufficient to allow the non-moving party to carry its burden of proof. See Celotex v. Catrett, 477 U.S. 317, 323 (1986).  Provided the moving party has satisfied this burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  Scott v. Harris, 550 U.S. 372, 380 (2007).  Instead, if the moving party has carried its burden, the non-moving party must then respond by identifying specific facts, supported by evidence, which show a

---

[4] The rule providing for summary judgment was previously set forth in Rule 56(c) of the Federal Rules of Civil Procedure, with some minor differences in the language then used.  The rule was amended in December 2010 to provide for the summary judgment standard in Rule 56(a), and by replacing the word "issue" with "dispute," which "better reflects the focus of a summary-judgment determination." Rule 56, Advisory Committee Notes.

genuine issue for trial, and may not rely upon the allegations or denials of its pleadings.  See Martin v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007); see also Fed. R. Civ. P. 56(c).

In adjudicating the motion, the court must view the evidence presented in the light most favorable to the opposing party, Anderson, 477 U.S. at 255, and draw all reasonable inferences in the light most favorable to the non-moving party, Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).  Where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true.  Id.  Additionally, the court is not to decide whether the evidence unquestionably favors one side or the other, or to make credibility determinations, but instead must decide whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented.  Id. at 252; see also Big Apple BMW, 974 F.2d at 1363.  In reaching this determination, the Third Circuit has instructed that:

> To raise a genuine issue of material fact . . . the opponent need not match, item for item, each piece of evidence proffered by the movant.  In practical terms, if the opponent has exceeded the "mere scintilla" threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent.  It thus remains the province of the factfinder to ascertain the believability and weight of the evidence.

Id.  In contrast, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal quotation marks omitted); NAACP v. North Hudson Reg'l Fire & Rescue, 665 F.3d 464, 476 (3d Cir. 2011).

### B.   Legal Standards Governing Eighth Amendment "Deliberate Indifference" Claims in a Prison Medical Context

Liberally construed, the gravamen of Hyde's complaint is that prison officials violated Hyde's rights under the Eighth Amendment to the United States Constitution by displaying "deliberate indifference" to this inmate's medical needs.  Hyde faces an exacting burden in advancing this Eighth Amendment claim against prison officials in their individual capacities.  To sustain such a claim, Hyde must plead facts which:

> [M]eet two requirements: (1) "the deprivation alleged must be, objectively, sufficiently serious;" and (2) the "prison official must have a sufficiently culpable state of mind." Farmer v. Brennan, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quotation marks and citations omitted). In prison conditions cases, "that state of mind is one of 'deliberate indifference' to inmate health or safety." Id. "Deliberate indifference" is a subjective standard under Farmer-the prison official-defendant must actually have known or been aware of the excessive risk to inmate safety.

Beers-Capitol v. Whetzel,256 F.3d 120, 125 (3d Cir. 2001).

By including a subjective intent component in this Eighth Amendment benchmark, the courts have held that a mere generalized knowledge that prisons are dangerous places

does not give rise to an Eighth Amendment claim.  See Jones v. Beard, 145 F. App'x 743 (3d Cir. 2005)(finding no Eighth Amendment violation where inmate-plaintiff complained about cellmate who had a history of psychological problems, but where plaintiff failed to articulate a specific threat of harm during the weeks prior to an attack.)  In short, when "analyzing deliberate indifference, a court must determine whether the prison official 'acted or failed to act despite his knowledge of a substantial risk of serious harm.' Farmer v. Brennan, 511 U.S. 825, 841 (1994).  A prisoner plaintiff must prove that the prison official 'knows of and disregards an excessive risk to inmate health or safety.' Id . at 837." Garvey v. Martinez, 08-2217, 2010 WL 569852, at *6 (M.D.Pa. Feb. 11, 2010).

These principles apply with particular force to Eighth Amendment claims premised upon inadequate medical care.  In the medical context, a constitutional violation under the Eighth Amendment occurs only when state officials are deliberately indifferent to an inmate's serious medical needs.  Estelle v. Gamble, 429 U.S. 97, 105 (1976).  To establish a violation of his constitutional right to adequate medical care in accordance with this standard, Hyde is required to point to evidence that demonstrates (1) a serious medical need, and (2) acts or omissions by prison officials that indicate deliberate indifference to that need.  Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999).

Deliberate indifference to a serious medical need involves the "unnecessary and wanton infliction of pain." Estelle, 429 U.S. at 104. Such indifference may be evidenced by an intentional refusal to provide care, delayed provision of medical treatment for non-medical reasons, denial of prescribed medical treatment, denial of reasonable requests for treatment that results in suffering or risk of injury, Durmer v. O'Carroll, 991 F.2d 64, 68 (3d Cir. 1993), or "persistent conduct in the face of resultant pain and risk of permanent injury," White v. Napoleon, 897 F.2d 103, 109 (3d Cir. 1990).

However, it is also clear that the mere misdiagnosis of a condition or medical need, or negligent treatment provided for a condition, is not actionable as an Eighth Amendment claim because medical malpractice is not a constitutional violation. Estelle, 429 U.S. at 106. "Indeed, prison authorities are accorded considerable latitude in the diagnosis and treatment of prisoners." Durmer, 991 F.2d at 67 (citations omitted). Furthermore, in a prison medical context, deliberate indifference is generally not found when some significant level of medical care has been offered to the inmate. Clark v. Doe, 2000 U.S. Dist. LEXIS 14999, 2000 WL 1522855, at *2 (E.D.Pa. Oct. 13, 2000)("courts have consistently rejected Eighth Amendment claims where an inmate has received some level of medical care"). Thus, such complaints fail as constitutional claims under § 1983 since "the exercise by a doctor of his professional

judgment is never deliberate indifference. See e.g. Brown v. Borough of Chambersburg, 903 F.2d 274, 278 (3d Cir.1990) ('[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights.')". Gindraw v. Dendler, 967 F.Supp. 833, 836 (E.D. Pa. 1997).  Applying this exacting standard, courts have frequently rejected Eighth Amendment claims that are based upon the level of professional care that an inmate received; see, e.g., Ham v. Greer, 269 F. App'x 149 (3d Cir. 2008); James v. Dep't of Corrections, 230 F. App'x 195 (3d. Cir. 2007); Gillespie v. Hogan, 182 F. App'x 103 (3d Cir. 2006); Bronson v. White, No. 05-2150, 2007 WL 3033865 (M.D. Pa. Oct. 15, 2007); Gindraw v. Dendler, 967 F.Supp. 833 (E.D. Pa. 1997), particularly where it can be shown that significant medical services were provided to the inmate but the prisoner is dissatisfied with the outcome of these services.  Instead, courts have defined the precise burden which an inmate must sustain in order to advance an Eighth Amendment claim against a healthcare professional premised on allegedly inadequate care, stating that:

> The district court [may] properly dis[miss an] Eighth Amendment claim, as it concerned [a care giver], because [the] allegations merely amounted to a disagreement over the proper course of his treatment and thus failed to allege a reckless disregard with respect to his . . . care. The standard for cruel and unusual punishment under the Eighth Amendment, established by the Supreme Court in Estelle v. Gamble, 429 U.S. 97, 104 (1976), and its progeny, has two prongs: 1) deliberate indifference by prison officials and 2) serious medical needs. "It is well-settled that claims of negligence or medical malpractice, without some more culpable state of mind, do not constitute 'deliberate indifference.' " "Nor does

> mere disagreement as to the proper medical treatment support a claim of an eighth amendment violation." . . . . [The inmate] alleged no undue delay in receiving treatment and, as the district court noted, the evidence he presented established that he received timely care . . . . Although [an inmate plaintiff] may have preferred a different course of treatment, [t]his preference alone cannot establish deliberate indifference as such second-guessing is not the province of the courts.

James, 230 F. App'x. at 197-198.(citations omitted).

In short, in the context of the Eighth Amendment, any attempt to second-guess the propriety or adequacy of a particular course of treatment is disavowed by courts since such determinations remain a question of sound professional judgment. Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979) (quoting Bowring v. Godwin, 551 F.2d 44, 48 (4th Cir. 1977)).

There is a necessary corollary to this principle, limiting the reach of the Eighth Amendment in a prison medical setting. In a case such as this, where the plaintiff's complaint reflects that an inmate received some level of on-going medical care, it is also well-established that non-medical correctional staff may not be "considered deliberately indifferent simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor." Durmer v. O'Carroll, 991 F.2d 64, 69 (3d. Cir. 1993). The rationale for this rule has been aptly explained by the United States Court of Appeals for the Third Circuit in the following terms:

> If a prisoner is under the care of medical experts . . . , a non-medical prison official will generally be justified in believing that the prisoner is in capable hands. This follows naturally from the division of labor within a prison. Inmate health and safety is promoted by dividing responsibility for various aspects of inmate life among guards, administrators, physicians, and so on. Holding a non-medical prison official liable in a case where a prisoner was under a physician's care would strain this division of labor. Moreover, under such a regime, non-medical officials could even have a perverse incentive *not* to delegate treatment responsibility to the very physicians most likely to be able to help prisoners, for fear of vicarious liability. Accordingly, we conclude that, absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference.

Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004).

Applying this standard, courts have repeatedly held that, absent some reason to believe that prison medical staff are mistreating prisoners, non-medical corrections staff who refer inmate medical complaints to physicians may not be held personally liable for medically-based Eighth Amendment claims.  See, e.g., Johnson v. Doughty, 433 F.3d 1001 (7th Cir. 2006); Spruill v. Gillis, supra; Durmer v. O'Connor, supra; Garvey v. Martinez, No. 08-2217, 2010 WL 569852 (M.D. Pa. Feb. 11, 2010); Hodge v. United States. No. 06-1622, 2007 WL 2571938 (M.D. Pa. Aug. 31, 2007).

Furthermore, it is equally clear that a claim of a constitutional deprivation cannot be premised merely on the fact that the named defendants were prison supervisors when the incidents set forth in the complaint occurred.  Quite the contrary,

to state a constitutional tort claim the plaintiff must show that the supervisory defendants actively deprived him of a right secured by the Constitution.  Morse v. Lower Merion School Dist., 132 F.3d 902 (3d Cir. 1997); see also Maine v.Thiboutot, 448 U.S. 1 (1980).  Constitutional tort liability is personal in nature and can only follow personal involvement in the alleged wrongful conduct shown through specific allegations of personal direction or of actual knowledge and acquiescence in the challenged practice.  Robinson v. City of Pittsburgh, 120 F.3d 1286 (3d Cir. 1997).

In particular, with respect to prison supervisors it is well-established that:

> "A[n individual government] defendant in a civil rights action must have personal involvement in the alleged wrongdoing; liability cannot be predicated solely on the operation of *respondeat superior*. Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir.1988).

Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005).

As the Supreme Court has observed:

> Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*. . . . See Monell v. New York City Dept. of Social Servs., 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (finding no vicarious liability for a municipal "person" under 42 U.S.C. § 1983); see also Dunlop v. Munroe, 7 Cranch 242, 269, 3 L.Ed. 329 (1812) (a federal official's liability "will only result from his own neglect in not properly superintending the discharge" of his subordinates' duties); Robertson v. Sichel, 127 U.S. 507, 515-516, 8 S.Ct. 1286, 3 L.Ed. 203 (1888) ("A public officer or agent is not responsible for the misfeasances or position wrongs, or for the nonfeasances, or negligences, or omissions of duty, of

> the subagents or servants or other persons properly employed by or under him, in the discharge of his official duties"). Because vicarious liability is inapplicable to <u>Bivens</u> and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.

<u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 676 (2009).

Applying these benchmarks, courts have frequently held that, in the absence of evidence of supervisory knowledge and approval of subordinates' actions, a plaintiff may not maintain an action against supervisors based upon the misdeeds of their subordinates. <u>O'Connell v. Sobina</u>, No. 06-238, 2008 WL 144199, * 21 (W.D. Pa. Jan. 11, 2008); <u>Neuburger v. Thompson</u>, 305 F. Supp. 2d 521, 535 (W. D. Pa. 2004). Rather, "[p]ersonal involvement must be alleged *and is only present where the supervisor directed the actions of supervisees or actually knew of the actions and acquiesced in them*. <u>See</u> <u>Rode v. Dellarciprete</u>*, 845 F.2d 1195, 1207 (3d Cir.1988)."* <u>Jetter v. Beard</u>, 183 F. App'x 178, 181 (3d Cir. 2006)(emphasis added).

Similarly exacting standards apply to constitutional claims made against local government entities, like a board of county commissioners. Municipalities and other local governmental entities may not be held liable under § 1983 for the acts of their employees under a theory of *respondeat superior* or vicarious liability.  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 676 (2009); <u>see also</u> <u>Colburn v. Upper Darby Twp.</u>, 946 F.2d 1017, 1027 (3d Cir. 1991).  However, a local government entity may be held liable

"when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978).  A plaintiff must "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury" to prevail.  Bd. of County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 403 (1997).  This custom must be "so widespread as to have the force of law."  Id. at 404; see also Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir. 1996) (a policy is an official proclamation or edict of a municipality, while a custom is a practice that is "so permanent and well settled as to virtually constitute law") (quoting Andrews v. City of Phila., 895 F.2d 1469, 1480 (3d Cir. 1990) (citations omitted).

The plaintiff must further "allege that a 'policy or custom' of [the defendants] was the 'moving force' behind the [constitutional] violation." Grayson v. Mayview State Hosp., 293 F.3d 103, 107 (3d Cir. 2002) (citing Brown, 520 U.S. at 404).  A local government entity  can be held liable on the basis of failure to train when "that failure amounts to 'deliberate indifference . . . [of the constitutional] rights of persons. . . .'" Woloszyn v. County of Lawrence, 396 F.3d 314, 324 (3d Cir. 2005) (citations omitted).  There must also be a causal nexus, in that the "'identified deficiency in [the] training program must be closely related to the ultimate [constitutional] injury.'" Id. at 325 (citations omitted).  In summary, analysis of a claim under Monell requires

separate analysis of two distinct issues:  "(1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so whether the [municipality] is responsible for that violation."  Collins v. City of Harker Heights, Texas, 503 U.S. 115, 120 (1992).

A local government entity may be liable for constitutional violations resulting from inadequate training or supervision of its employees if the failure to train amounts to a custom of the municipality.  Such a failure must "amount[] to deliberate indifference to the constitutional rights of persons with whom the police come in contact."  Colburn, 946 F.2d at 1028 (citing City of Canton v. Harris, 489 U.S. 378, 388 (1989)).  To prove such institutional liability on a theory of deliberate indifference is an especially difficult showing for a plaintiff to satisfy where the plaintiff has alleged that insufficient training or supervision has caused constitutional violations. Reitz v. County of Bucks, 125 F.3d 139, 145 (3d Cir. 1997).  Such a showing requires that "(1) municipal lawmakers know that employees will confront a similar situation; (2) the situation involves a difficult choice or a history of employees mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights."  Carter v. City of Phila., 181 F.3d 339, 357 (3d Cir. 1999). Moreover, the plaintiff proceeding on such a theory must establish that the municipality's "deliberate conduct . . . was the 'moving force' behind the injury alleged."  Reitz, 125 F.3d at 145 (quoting Brown, 520 U.S. at 404).  The need for training, supervision, or other corrective action to avoid imminent deprivations of a

constitutional right "must be so apparent that any reasonable policymaker or supervisor would have taken appropriate preventive measures." Horton v. City of Harrisburg, No. 06-2338, 2009 U.S. Dist. LEXIS 63428, *13 (M.D. Pa. July 23, 2009) (quoting Strauss v. Walsh, No. Civ. A. 01-3625, 2002 U.S. Dist. LEXIS 24717, 2002 WL 32341791, at *3 (E.D. Pa. Dec. 17, 2002)). Additionally, in order to recover for municipal liability on a failure-to-train theory, the alleged failure must be "closely related to the ultimate (constitutional) injury." Woloszyn, 396 F.3d at 325.

The Supreme Court has recently reaffirmed the guiding principles which define local government entity civil rights liability based upon a failure to train or oversee staff. In Connick v. Thompson, – U.S.– , 131 S.Ct. 1350, 1359 (2011), the court described the parameters of institutional liability in the following terms:

> A municipality or other local government may be liable . . .if the governmental body itself "subjects" a person to a deprivation of rights or "causes" a person "to be subjected" to such deprivation. See Monell v. New York City Dept. of Social Servs., 436 U.S. 658, 692 (1978). But, under § 1983, local governments are responsible only for "their *own* illegal acts." Pembaur v. Cincinnati, 475 U.S. 469, 479(1986) . . . . They are not vicariously liable under § 1983 for their employees' actions. . . . Plaintiffs who seek to impose liability on local governments under § 1983 must prove that "action pursuant to official municipal policy" caused their injury. Monell, 436 U.S., at 691. Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law. . . . . These are "action[s] for which the municipality is actually responsible." Pembaur, supra, at 479–480. In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may

rise to the level of an official government policy for purposes of § 1983. A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train. See <u>Oklahoma City v. Tuttle</u>, 471 U.S. 808, 822–823 (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training' " is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell* "). To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." . . . . Only then "can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983. . . . " '[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." . . . . Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program.

<u>Id</u>.(some citations deleted).

### D.      Disputed Material Issues of Fact Preclude Summary Judgment in Favor of Defendant Nurse Yeager

In this case, we conclude at the outset that disputed material issues of fact

preclude any consideration of summary judgment in favor of at least one defendant,

Nurse Yeager.  Here, the gist of Hyde's Eighth Amendment deliberate indifference

claim against this defendant is Hyde's assertion that Nurse Yeager deliberately

neglected his requests for care and delayed his receipt of medical treatment.  As a legal

matter, such a claim can support a constitutional tort under the Eighth Amendment's

deliberate indifference standard  since deliberate indifference may be evidenced by an

intentional refusal to provide care, delayed provision of medical treatment for non-medical reasons, denial of prescribed medical treatment, or the denial of reasonable requests for treatment that results in suffering or risk of injury.  Durmer v. O'Carroll, 991 F.2d 64, 68 (3d Cir. 1993).

Moreover, in this case the question of whether Nurse Yeager delayed and denied treatment for Hyde involves the resolution of fundamental factual conflicts.  At the outset, with respect to the initial delay in treating Hyde between November 2007 and August 2008, these parties present starkly contrasting factual narratives.  Hyde insists that he made numerous requests for care and treatment of these skin cancer lesions between November 2007 and the summer of 2008, and supports this assertion both with an affidavit from a fellow inmate who attests that he was present when Hyde made these requests in 2007 and 2008, as well as a declaration from the plaintiff's brother, who alleges that he asked that Hyde receive medical attention for these lesions in June of 2008.  (Doc. 46.)  Defendant Yeager, in contrast, denies ever receiving any of these requests for medical attention from Hyde in 2007 and 2008, (Doc. 42.), and supports this assertion by referring to prison medical records, which do not reflect any written requests or grievances relating to medical care issues.

Similarly, Hyde and Nurse Yeager have sharply conflicting factual accounts of the reasons why Hyde did not receive surgery for a year after his September 2008

cancer diagnosis while he was held at the Northumberland County Prison.  Nurse

Yeager avers that: "after his evaluation by Dr. Delaney at Geisinger on September 16,

2008, Mr. Hyde advised that he wished to have the recommended surgery done outside

the prison and began to seek a medical furlough.  Mr. Hyde was not deprived of the

surgical procedure that was recommended by Dr. Delaney.  Mr. Hyde chose not to

have the procedure performed at Geisinger Medical Center during his period of

incarceration at Northumberland County Prison." (Doc. 42-1.)  Hyde, in turn, flatly

contests this claim made by Nurse Yeager describing the claim in the following terms:

> This incredible lie and cover up is too hard for any rational mind to
> believe. Why under any stretch of the imagination would Mr. Hyde tell
> Nurse Yeager for approximately 24 months . . .  That he needed to have
> his cancer removed before it spread to his body and eye and then Nurse
> Yeager claims Mr. Hyde changed his mind and waited another 15 months
> (from Sept. 2008 until Dec. 2009) until he was release after completing
> his full sentence to have the cancer removed?

(Doc. 46, p. 9.)

These clearly drawn factual conflicts, in our view, define a genuine dispute as

to material facts, a factual dispute which precludes summary judgment in favor of this

defendant.

**E.** **Warden Reisch and the County Commissioners Are Entitled to Summary Judgment**

In contrast, we find that Warden Reisch and the County Commissioners are entitled to judgment in their favor as a matter of law.  At the outset, with respect to the warden this is not a case where Hyde has shown that Warden Reisch "directed the [allegedly unconstitutional] actions of supervisees or actually knew of the actions and acquiesced in them.  See Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir.1988)." Jetter v. Beard, 183 F. App'x 178, 181 (3d Cir. 2006).  Rather, the only evidence relating to the warden's role in this conduct is that Hyde's brother contacted the warden in July 2008, and then Hyde promptly received two medical assessments of his needs in August and September 2008.  Thus, the evidence strongly suggests that when Warden Reisch was directly contracted, Hyde received prompt follow-up medical care. Since non-medical corrections staff, like Warden Reisch, who refer inmate medical complaints to physicians may not be held personally liable for medically-based Eighth Amendment claims, see, e.g., Johnson v. Doughty, 433 F.3d 1001 (7th Cir. 2006); Spruill v. Gillis, supra; Durmer v. O'Connor, supra, the warden's actions in referring Hyde's medical complaints to medical staff were lawful, and appropriate, and may not give rise to liability for this supervisory official.

While Hyde further alleges that the warden and the county commissioners had a policy of refusing expensive medical treatment for inmates like himself, Hyde has

presented no support for this theory beyond his own speculate assertion, and has in fact specifically denied ever being told that the prison would not pay for his treatment. (Doc. 42-1, Hyde deposition p.13.)  A party, like Hyde, who seeks to resist a summary judgment motion by citing to disputed material issues of fact must show by competent evidence that such factual disputes exist.  Further, "only evidence which is admissible at trial may be considered in ruling on a motion for summary judgment." Countryside Oil Co., Inc. v. Travelers Ins. Co., 928 F.Supp. 474, 482 (D.N.J.1995).  Similarly, it is well-settled that: "[o]ne cannot create an issue of fact merely by . . . denying averments . . . without producing any supporting evidence of the denials." Thimons v. PNC Bank, NA, 254 F. App'x 896, 899 (3d Cir. 2007)(citation omitted).  Thus, "[w]hen a motion for summary judgment is made and supported . . ., an adverse party may not rest upon mere allegations or denial." Fireman's Ins. Co. Of Newark NJ v. DuFresne, 676 F.2d 965, 968 (3d Cir. 1982), see Sunshine Books, Ltd. v. Temple University, 697 F.2d 90, 96 (3d Cir. 1982)."  [A] mere denial is insufficient to raise a disputed issue of fact, and an unsubstantiated doubt as to the veracity of the opposing affidavit is also not sufficient." Lockhart v. Hoenstine, 411 F.2d 455, 458 (3d Cir. 1969).  Furthermore, "a party resisting a [Rule 56] motion cannot expect to rely merely upon bare assertions, conclusory allegations or suspicions." Gans v. Mundy, 762 F.2d 338, 341 (3d Cir. 1985)(citing Ness v. Marshall, 660 F.2d 517, 519 (3d Cir. 1981)).

Here, Hyde's assertions as to the existence of a policy, adopted by the warden and county commissioners, to deny him medical care rests "merely upon bare assertions, conclusory allegations or suspicions." Gans v. Mundy, 762 F.2d 338, 341 (3d Cir. 1985)(citing Ness v. Marshall, 660 F.2d 517, 519 (3d Cir. 1981)).  As such, Hyde's claims are insufficient to defeat this summary judgment motion, and it is recommended that the court grant summary judgment in favor of defendants Reisch and the County Commissioner defendants.[5]

## III.  Recommendation

Accordingly, for the foregoing reasons, IT IS RECOMMENDED that the defendants' motion for summary judgment (Doc. 41.) be GRANTED, in part, and DENIED, in part, as follows:

_____

[5] While we have construed Hyde's claim against the county commissioners as an institutional liability claim, to the extent that Hyde actually seeks to hold unnamed county commissioners personally liable his complaint runs afoul of yet another legal obstacle. In essence, Hyde is maintaining this action against unnamed parties.  Hyde may not continue to maintain an action against unnamed individual defendants after some two years of litigation. Indeed, where a plaintiff has been unable to identify the actual parties he wishes to sue by name after years of litigation, the proper exercise of this court's broad discretion in these matters would call for the dismissal of these currently unnamed parties. See Blakeslee v. Clinton County, 336 F. App'x 248 (3d Cir.2009) (affirming dismissal of fictitious defendants after ten months of litigation). Ball v. Bower, 1:10-CV-2561, 2011 WL 6782621 (M.D. Pa. Oct. 13, 2011) report and recommendation adopted, 1:10-CV-2561, 2011 WL 6782428 (M.D. Pa. Dec. 21, 2011).

1.     The motion for summary judgment should be GRANTED with respect

to defendant Reisch and the county commissioner defendants, but;

2.     The motion for summary judgment should be DENIED with respect to

defendant Yeager.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions

Submitted this 10th day of August 2012.

*S/Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge